No. 18-3535

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

_____

MICHAEL JOHNSON,

*Plaintiff-Appellant,*

v.

SUSAN PRENTICE, et al.,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Central District of Illinois, No. 1:16-cv-1244
Before the Hon. Colin S. Bruce

_____

## PLAINTIFF-APPELLANT MICHAEL JOHNSON'S PETITION FOR
## REHEARING OR REHEARING EN BANC

_____

Daniel M. Greenfield
RODERICK & SOLANGE MACARTHUR
JUSTICE CENTER
NORTHWESTERN PRITZKER SCHOOL OF LAW
375 E. Chicago Avenue
Chicago, IL 60611
(312) 503-8538
daniel-greenfield@law.northwestern.edu

*Counsel for Plaintiff-Appellant Michael
Johnson*

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 18-3535

Short Caption: Johnson v. Prentice, et al.

　　To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

　　The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ 　　**PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)　　The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Michael R. Johnson

_____

(2)　　The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Roderick & Solange MacArthur Justice Center

Northwestern Pritzker School of Law

(3)　　If the party, amicus or intervenor is a corporation:

　　i)　　Identify all its parent corporations, if any; and

　　　　n/a

　　ii)　　list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

　　　　n/a

(4)　　Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

n/a

(5)　　Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

n/a

Attorney's Signature: /s/ Daniel M. Greenfield　　　　　　Date: May 18, 2022

Attorney's Printed Name:　Daniel M. Greenfield

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).　**Yes** ☑　**No** ☐

Address:　Roderick & Solange MacArthur Justice Center / Northwestern Pritzker School of Law

　　　　375 East Chicago Ave., Chicago, IL 60611

Phone Number: (312) 503-8538　　　　　　Fax Number: (312) 503-1272

E-Mail Address: daniel-greefield@law.northwestern.edu

rev. 12/19 AK

# TABLE OF CONTENTS

**Page(s)**

CORPORATE DISCLOSURE STATEMENT ..........................................................i

TABLE OF AUTHORITIES .................................................................... iii

RULE 35(B) STATEMENT ...................................................................1

FACTUAL BACKGROUND....................................................................5

PROCEDURAL HISTORY......................................................................8

ARGUMENT .........................................................................................11

I.     The Panel Majority Erred By Applying A Criminal Sentencing Proportionality Framework To A Conditions-Of-Confinement Claim.........11

II.    Applying The Correct Standard Demonstrates How Badly The Majority Missed The Mark. ...........................................................................13

III.   The Majority's Approach Virtually Assures That Dangerous Conditions Of Confinement Will Proliferate Within Prisons. .........................................15

CONCLUSION......................................................................................17

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Apodaca v. Raemisch*,
  139 S. Ct. 5 (2018) .........................................................................3, 5

*Delaney v. DeTella*,
  256 F.3d 679 (7th Cir. 2001) ...........................................1, 11, 12, 13

*Edwards v. Quiros*,
  986 F.3d 187 (2d Cir. 2021) ........................................................3, 11

*Estelle v. Gamble*,
  429 U.S. 97 (1976).........................................................1, 11, 12

*Farmer v. Brennan*,
  511 U.S. 825 (1994).........................................................1, 2, 12

*Graham v. Florida*,
  560 U.S. 48 (2010)..............................................................3, 13

*Hope v. Pelzer*,
  536 U.S. 730 (2002)...........................................................*passim*

*LeMaire v. Maass*,
  12 F.3d 1444 (9th Cir. 1993) ........................................................3, 11

*Mitchell v. Rice*,
  954 F.2d 187 (4th Cir.1992) ................................................................3

*Pearson v. Ramos*,
  237 F.3d 881 (7th Cir. 2001) ........................................................1, 13

*Wilson v. Seiter*,
  501 U.S. 294 (1991)..........................................................1, 11, 12

**Statutes**

Correctional Leaders Association & Arthur Liman Center for Public
  Interest Law, Time-In-Cell 2019 (2019) .............................................16

**Other Authorities**

Fed. R. App. P. 35 ...................................................................................1

Fed. R. App. P. 40 ...................................................................................1

Pursuant to Federal Rules of Appellate Procedure 35 and 40, Appellant Michael Johnson seeks panel rehearing or rehearing en banc.

## RULE 35(B) STATEMENT

The opinion of the panel majority warrants rehearing en banc. First, it conflicts with Supreme Court, Seventh Circuit, and out-of-circuit precedent. Consideration by the en banc court is therefore necessary to ensure the uniformity of this Court's decisions. Second, it raises questions of exceptional importance.

Appropriating an ill-fitting criminal sentencing proportionality framework from the divided opinion of this Court in *Pearson v. Ramos*, 237 F.3d 881 (7th Cir. 2001), the panel majority held that it categorically does not violate the Eighth Amendment to punish prisoners by withholding exercise—in this case, for three *years*—"unless the sanctions were meted out for some utterly trivial infraction of the prison's disciplinary rules." Op.13-14 (quotations omitted). That holding conflicts with*, inter alia*, *Estelle v. Gamble*, 429 U.S. 97 (1976); *Wilson v. Seiter*, 501 U.S. 294 (1991); *Farmer v. Brennan*, 511 U.S. 825 (1994); *Hope v. Pelzer*, 536 U.S. 730 (2002); and *Delaney v. DeTella*, 256 F.3d 679 (7th Cir. 2001).

Those decisions establish that conditions-of-confinement cases concerning deprivations of essential human needs such as food, shelter, and exercise, are reviewed under the familiar deliberate indifference framework—not a sentencing proportionality standard. And for good reason. The Eighth Amendment "imposes

duties on [prison] officials, who must provide humane conditions of confinement."
*Farmer*, 511 U.S. at 832. Thus, prison officials may not withhold "the minimal
civilized measure of life's necessities" or inflict "conditions posing a substantial risk
of serious harm." *Id*. at 834. These bedrock principles carry the day even when
prisoners commit infractions. The Eighth Amendment's promise to provide for basic
human needs and its prohibition on dangerous conditions do not evaporate in the
face of misconduct. To the contrary, an "Eighth Amendment violation is obvious" if
a prisoner is punished in a manner that subjects him to "a substantial risk of physical
harm, [and] to unnecessary pain" "[d]espite the clear lack of an emergency
situation." *Hope*, 536 U.S. at 738.

At the same time, prison officials are duty bound to maintain secure
correctional facilities. The traditional deliberate indifference framework effectively
balances those competing values—health on the one hand, prison security on the
other. *See* Op.30 (Rovner, J., dissenting) (noting that this Court's "cases establish
that basic human needs cannot be denied as a punishment unrelated to serious
immediate security and safety needs").

Consider the deprivation at issue here. This Court has long recognized that
routine access to exercise is critical to preserving mental and physical health. Op.20-
21 (Rovner, J., dissenting) (citing cases). It has also often explained that such
opportunities are even more essential in the context of prisoners relegated to solitary

confinement. Op.30 (Rovner, J., dissenting). Thus, it has been held—repeatedly—by this Court and others that the basic human need of exercise can only be regularly withheld if a compelling security justification necessitates the deprivation. Op.25 (Rovner, J., dissenting); *see also, e.g.*, *Apodaca v. Raemisch*, 139 S. Ct. 5, 7-8 (2018) (statement of Sotomayor, J., concerning denial of certiorari) (explaining that "the presence (or absence) of a particularly compelling security justification has, rightly, played an important role in the analysis of the Courts of Appeals," and that "[i]t should be clear by now that our Constitution does not permit such a total deprivation [of outdoor exercise] in the absence of a particularly compelling interest"); *Edwards v. Quiros*, 986 F.3d 187, 192-95 (2d Cir. 2021); *LeMaire v. Maass*, 12 F.3d 1444, 1457-58 (9th Cir. 1993); *Mitchell v. Rice*, 954 F.2d 187, 192 (4th Cir.1992) (collecting cases). In other words, exercise may be denied if—and only if—exercise poses an intolerable security risk. Op.25 (Rovner, J., dissenting)

A criminal sentencing proportionality framework, by contrast, does not weigh the deprivation of basic human needs against prison security. Rather, it involves a multi-factor comparison of the relevant conduct, the sentence, the characteristics of the offender, and other sentences imposed for the same conduct. *E.g.*, *Graham v. Florida*, 560 U.S. 48, 88 (2010) (Roberts, C.J., concurring).

The opinion in this case exemplifies the shortcomings of the majority's proportionality approach. For nearly three *years*, prison officials denied Michael

3

Johnson—a prisoner designated seriously mentally ill (SMI) by the Illinois Department of Corrections (IDOC) and consigned to solitary confinement—virtually all exercise. As a result, Mr. Johnson was subjected to what amounts to "24/7 solitary confinement" in a cell far too cramped to permit in-cell exercise. Op.18 (Rovner, J., dissenting); App.471; App.556.

Defendants offer no security justification for this deprivation, and the summary judgment record confirms none existed. Op.33-34 (Rovner, J., dissenting). Rather, prison officials withheld exercise in response to misconduct that was unrelated to and did not occur in connection with exercise, was occasioned by mental illness—illness that was itself exacerbated by prolonged solitary confinement—and did not implicate a security or safety threat regarding access to the yard. Op.17-19 & n.1, 30, 32-34 (Rovner, J., dissenting). The consequences of the deprivation were both "terrible and predictable," and Mr. Johnson's fragile mental health declined precipitously—he repeatedly attempted suicide, smeared his body with feces, tore at his own flesh, and experienced one mental health crisis after another. Op.18 (Rovner, J., dissenting). He deteriorated physically, too. Op.18-19 (Rovner, J., dissenting).

Under the majority's novel approach, such facts are irrelevant. The analysis starts and stops with a proportionality test; consequences—even those as significant as dangerously deteriorating health—simply do not factor into the equation.

Without rehearing en banc, holding prisoners "in 'near-total isolation' from the living world, in what comes perilously close to a penal tomb," *Apodaca*, 139 S. Ct. at 7-8 (statement of Sotomayor, J., respecting denial of certiorari) (citation omitted), may become commonplace. The majority's proportionality approach leaves prison officials with virtually boundless discretion to impose punishment—even punishments that withhold basic human needs and place prisoners in harm's way—so long as an acceptable comparator can be identified. But that is almost no limitation at all.

## FACTUAL BACKGROUND

Michael Johnson is afflicted with numerous mental illnesses, including bipolar disorder, severe depression, anxiety, and excoriation disorder.[1] Op.18 (Rovner, J., dissenting). Even though it is widely accepted that solitary confinement exacerbates and can even precipitate mental illness, Op.19 n.1 (Rovner, J., dissenting) (collecting cases), prison officials held Mr. Johnson in solitary confinement at various facilities for more than nine years, App.535-36; App.572-78.

---

[1] Excoriation disorder—also known as dermatillomania—is the compulsive picking of one's own skin, often to the point of injury and disfiguration. Op.3-4; Op.18 (Rovner, J., dissenting); *see also* Dermatillomania, Cleveland Clinic, https://my.clevelandclinic.org/health/diseases/22706-dermatillomania-skin-picking.

At Pontiac, where Mr. Johnson endured more than three years of this solitary confinement, he was "held in isolation day and night, in a windowless cell, with a cell light that remained on 24/7, and behind a door that for most or all of his cell placements was a solid one." Op.18 (Rovner, J., dissenting). Permitted to leave his cell in shackles "once per week for a ten minute shower" and to exercise in a single-person cage on a "weekly basis," the "rest of his time was spent in his cell in the segregation unit and therefore alone and isolated from others." Op.18 (Rovner, J., dissenting); App.555.

In isolation at Pontiac, Mr. Johnson's body and mind deteriorated, and he "engaged in the types of behavior, including the smearing of feces in his cell and on himself, that tragically [courts] see all too often among inmates kept in such conditions for long periods of time." Op.17-19 & n.1 (Rovner, J., dissenting). Prison officials punished Mr. Johnson severely for this and other misconduct, Op.17-19, 30-34 (Rovner, J., dissenting), even while conceding that mental illness was the genesis of some of his infractions, Op.33 (Rovner, J., dissenting).[2]

---

[2] In addition to covering himself with excrement, Mr. Johnson's infractions, included "spitting at or in the direction of other inmates and the throwing of feces, urine, or other liquid"; "covering his door window with feces"; "refusing to clean" smeared feces; "impairment of surveillance, disobeying an order, insolence, property damage, and giving false information to an employee." Op.31-32 (Rovner, J., dissenting).

One punishment included regular extensions to solitary confinement. Op.33 (Rovner, J., dissenting). Another punishment (the subject of Mr. Johnson's appeal), known by the euphemism "yard restriction," was the deprivation of "virtually all access to exercise" for "more than three years," the bulk of that period continuous.[3] Op.17-18 (Rovner, J., dissenting). While on yard restriction, Mr. Johnson was permitted "only one hour per *month* of yard time, and even that time was routinely eliminated, thus essentially resulting in '24/7' solitary confinement."[4] Op.18 (Rovner, J., dissenting). Mr. Johnson's cell, moreover, was too cramped to afford him any opportunity to exercise within it. Op.18 (Rovner, J., dissenting); App.471; App.556.

The "impact of that prolonged isolation without the critical outlet of exercise was both terrible and predictable." Op.18 (Rovner, J., dissenting). During that period, Mr. Johnson was "regularly on suicide watch," "suffered from hallucinations," and "excoriated his flesh." Op.18 (Rovner, J., dissenting). His "deteriorating mental state . . . virtually ensured further rules violations, creating a self-perpetuating cycle." Op.17 (Rovner, J., dissenting). He "experienced physical

---

[3] Each individual denial of exercise ranged from 30-90 days. Op.5. Because they were imposed consecutively, however, Mr. Johnson was "almost continuously under yard restrictions" for nearly three years. Op.18 (Rovner, J., dissenting).

[4] Indeed, from June 2015 through June 2016, Mr. Johnson was not permitted *any* exercise. Op.5.

deterioration," too—atrophied muscles, shaky hands, persistent headaches, and overwhelming fatigue. Op.18 (Rovner, J., dissenting); App.8 ¶¶37-38; App.10 ¶¶43-44; App.13 ¶¶62; App.539; App.660, 663, 712.

Despite the severity of the deprivation, prison personnel did not claim that "the yard restrictions were necessary for safety and security reasons." Op.33-34 (Rovner, J., dissenting). Indeed, "there are no allegations that *any* infraction occurred during yard time." Op.33. (Rovner, J., dissenting).

## PROCEDURAL HISTORY

Without an attorney, Mr. Johnson filed a Section 1983 complaint against the IDOC personnel responsible for denying him exercise for more than three years, contending that the condition of confinement violated the Eighth Amendment.[5] App.21. The district court granted defendants' motion for summary judgment. ShortApp.12-16.

Relying on *Pearson*, a divided panel of this Court affirmed.[6] Op.13-14. Compared to the facts of *Pearson*, the majority conceded that Mr. Johnson's exercise

---

[5] Mr. Johnson raised additional claims against additional defendants, including medical care claims brought against employees of Wexford Health Sources, in the district court and on appeal. He does not seek rehearing on any claim other than the Eighth Amendment exercise claim asserted against IDOC personnel.

[6] Curiously, the panel majority asserts that Mr. Johnson "largely abandoned the claims that were litigated below." Op.5. To the extent the majority intended to refer to the out-of-cell exercise claim, it is difficult to understand its conclusion. From start to finish, as Judge Rovner noted, Op.30-31 n.3 (Rovner, J., dissenting), Johnson

deprivation was "far longer" while his conduct was "not as violent." Op.14. Nonetheless, Mr. Johnson's worst infractions—"spitting on inmates or guards and throwing urine and feces"—were, in the majority's estimation, sufficiently "serious" and "dangerous" when measured against the *Pearson* conduct to comport with the Eighth Amendment.[7] Op.14. In the majority's view, an exercise restriction—whether analyzed "individually or in the aggregate"—categorically "does not violate the Eighth Amendment unless the sanctions were meted out for 'some utterly trivial

---

argued that defendants' unjustified restrictions on out-of-cell exercise violated the Eighth Amendment. *E.g.*, Opening Br. 4 (Statement of the Case) ("[F]or nearly four *years* Johnson was on 'yard restriction'—a classification entitling him to only one hour outside his cell per *month*. Even that monthly breather was often denied for insignificant reasons.") (citations omitted). True, Johnson described one consequence of that restriction as "24/7 solitary confinement." *E.g.*, Opening Br. 20 (Summary of Argument) ("This Court . . . has held that prolonged solitary confinement cannot be imposed without access to regular out-of-cell exercise (whether indoors or outdoors) unless a pressing security concern necessitates this severe restriction. Even assuming a dramatic security risk exists . . . a prisoner cannot be left for years in 24/7 solitary confinement while his physical and psychological health declines."). But it is abundantly clear that unbroken solitary confinement was contextualizing the deprivation. *E.g.*, Reply Br. 2 (Argument IA) ("Johnson argues two Eighth Amendment claims on appeal. First, that all Defendants subjected him to unconstitutional conditions of confinement by denying him indoor and outdoor exercise . . . a punishment that essentially relegated him to contaminated solitary confinement cells twenty-four hours a day, seven days a week, for years.").

[7] The infractions at issue in *Pearson* involved: "attacking and beating a guard such that the guard required hospitalization; setting fire to blankets, coats and boxes so as to require evacuation of prisoners with respiratory problems; spitting in the face of a guard who was trying to restrain him after he assaulted another guard; and throwing a broom and a bottle of bodily fluids at a medical technician, such that the fluids got in the victim's face." Op.23 (Rovner, J., dissenting). For that conduct, Pearson was denied out-of-cell exercise for *one* year. Op.23 (Rovner, J., dissenting).

infraction of the prison's disciplinary rules.'"[8] Op.13-14 (quoting *Pearson*, 237 F.3d at 885).

Judge Rovner dissented.[9] Op.17-34. This Court has long recognized both that "exercise," much like "food, clothing or warmth," is "a basic human need" and that no basic human need—let alone one "rendered even more critical for inmates in segregation"—"can[] be denied as a punishment unrelated to serious immediate security and safety needs." Op.30 (Rovner, J., dissenting). Here, though, the summary judgment record established that Mr. Johnson was routinely denied exercise for "disciplinary infractions that on their face do not involve any apparent security risk to yard access." Op.32-34 (Rovner, J., dissenting). Rather than a safety measure, prison officials denied exercise as a punitive, after-the-fact punishment. Op.29-30 (Rovner, J., dissenting). Because prison officials imposed a "total deprivation" of a basic human need without a countervailing security justification, Judge Rovner would have held—consistent with a long line of appellate cases examining exercise restrictions—that the Eighth Amendment had been violated. Op.30-34 (Rovner, J., dissenting).

---

[8] The majority asserts that Mr. Johnson did not argue below and on appeal that his misconduct was "trivial." Op.14. It was mistaken. *E.g.*, Op.30-31, n.3 (Rovner, J., dissenting).

[9] Judge Rovner concurred in the dismissal of those claims that Mr. Johnson does not press here. Op.17 (Rovner, J., dissenting).

**ARGUMENT**

## I. The Panel Majority Erred By Applying A Criminal Sentencing Proportionality Framework To A Conditions-Of-Confinement Claim.

The Eighth Amendment is famously context dependent. In the criminal sentencing context, it "imposes substantive limits on what can be made criminal and punished" and "proscribes punishments grossly disproportionate to the severity of the crime." *Estelle*, 429 U.S. at 103 n.7. But "[n]either of these principles is involved" when courts are called upon to determine whether prison conditions violate the Eighth Amendment. *Id.* at 103-04 & n.7.

Instead, "[i]n making this determination in the context of prison conditions, [courts] must ascertain whether the officials involved acted with 'deliberate indifference' to the inmates' health or safety." *Hope*, 536 U.S. at 737-38. Among those impermissible risks to the health or safety of incarcerated people are those occasioned by the deprivation of essential "human need[s] such as food, warmth, or *exercise*." *Wilson*, 501 U.S. at 304-05 (emphasis added).

These principles give rise to the familiar two-prong analysis long applied to conditions-of-confinement cases, including those concerning the deprivation of exercise. *E.g.*, *Delaney*, 256 F.3d at 683-85 (citing cases); *Edwards*, 986 F.3d at 192; *LeMaire*, 12 F.3d at 1457-58. In that context, "[a]n Eighth Amendment claim has two components—objective and subjective." *Delaney*, 256 F.3d at 683. In order "[t]o satisfy the objective component, the deprivation alleged must be, objectively,

11

sufficiently serious." *Id*. (internal quotations omitted). "The subjective component relates to a defendant's state of mind and requires a showing of deliberate indifference." *Id*.

Rather than analyze the exercise deprivation under the requisite deliberate indifference framework, the majority imported a proportionality standard from the criminal sentencing context and applied it to Mr. Johnson's conditions claim. Op.14. For reasons explained below, such a framework is an awkward fit—to say the least—for analyzing conditions claims. And applying it is all but impossible to reconcile with the clear directions from the Supreme Court, which has long held that conditions claims—including those involving exercise deprivations—are to be analyzed under the deliberate indifference framework. *E.g.*, *Estelle*, 429 U.S. at 103-04; *Wilson*, 501 U.S. at 303-04; *Farmer*, 511 U.S. at 834; *Hope*, 536 U.S. at 737-38.

For that reason, it should come as no surprise that the majority's opinion is a pronounced outlier. To counsel's knowledge, it reflects only the second time that a federal court of appeals has applied a criminal sentencing proportionality framework to an exercise deprivation claim. The other instance of which counsel is aware, which also occurred in a fractured decision in the Seventh Circuit, *Pearson v. Ramos*, provoked immediate criticism. Judge Ripple questioned whether the proportionality analysis applicable "to criminal sentences imposed by a court" was even "appropriate or helpful to the resolution" of a "case concern[ing] conditions of

confinement," noting that the majority had departed considerably from the "well-established" "principles governing a conditions of confinement claim." 237 F.3d at 888-89 (Ripple, J., concurring in the judgment). Illustrating this mismatch, after *Pearson* issued, this Court promptly resumed applying the deliberate indifference framework to exercise deprivation claims like this one.[10] *E.g.*, *Delaney*, 256 F.3d at 683.

## II. Applying The Correct Standard Demonstrates How Badly The Majority Missed The Mark.

As an examination of this case illustrates, it is with good reason that the majority's methodology is an outlier. "[A]ccess to exercise is not a perquisite or privilege to be used as a sword to ensure compliance with any institution rule"— rather, "[i]t is an essential human need" Op.17 (Rovner, J., dissenting). Since "restrictions which deny the prisoner the ability to exercise deprive him of a necessity for physical and mental well-being and create a strong likelihood of

---

[10] To be sure, *Pearson* was wrong the day it was decided. *See Pearson*, 237 F.3d at 888-89 (Ripple, J., concurring in the judgment). This Court should overrule it. But it need not do so to reverse the judgment of the district court. Even the majority's proportionality analysis was flawed under *Pearson*—it acknowledged both that Mr. Johnson's conduct was not as serious as the conduct at issue in *Pearson* and that Mr. Johnson was punished more severely, yet it was not troubled by the incomparable comparators. Op.14. But like comparators is a fundamental principle of proportionality analysis. *E.g.*, *Graham*, 560 U.S. at 88 (Roberts, C.J., concurring).

psychological injury," such a sanction "cannot be imposed lightly if it is to survive Eighth Amendment scrutiny." Op.21 (Rovner, J., dissenting).

The "common thread" in those cases considering exercise restrictions, therefore, is that exercise deprivations are only constitutional "where participation by the inmate in that yard time would present a serious security threat, such as the risk of an escape attempt or an attack on others in the yard." Op.25 (Rovner, J., dissenting). Thus, this Court has "repeatedly held" that "deny[ing] a prisoner *all* opportunity for exercise outside his cell would, the cases suggest, violate the Eighth Amendment unless the prisoner posed an acute security risk if allowed outside of his cell for even a short time." Op.25 (Rovner, J., dissenting) (quotations omitted). Other courts have, too. *Supra* at 3.

The "presence (or absence) of a particularly compelling security justification" for exercise restrictions "is consistent with [this Court's] treatment of deprivations of food or warmth." Op.25 (Rovner, J., dissenting) (quotations omitted). That is, this Court's "cases establish that basic human needs cannot be denied as a punishment unrelated to serious immediate security and safety needs." Op.30 (Rovner, J., dissenting).

Utilizing the proper framework illustrates by just how wide a mark the majority's analysis misses the target. The sanctioned "infractions did not indicate that Johnson would present a security risk or a safety threat if allowed access to the

yard, with its individual cages, to exercise." Op.33 (Rovner, J., dissenting). There is no evidence—indeed, no allegation—that "any infraction occurred during yard time." Op.33 (Rovner, J., dissenting). "Many, if not most, of the disciplinary infractions in this case do not signify any acute security risk, such as a threat of an escape attempt or a danger to other prisoners or correctional officers." Op.30 (Rovner, J., dissenting). And "defendants do not assert that there are indeed any such security concerns." Op.33 (Rovner, J., dissenting). These facts fundamentally distinguish Mr. Johnson's ordeal from cases upholding yard restrictions. Op.30 (Rovner, J., dissenting).

## III.    The Majority's Approach Virtually Assures That Dangerous Conditions Of Confinement Will Proliferate Within Prisons.

The deliberate indifference standard balances Mr. Johnson's basic human needs with the prison's security requirements and reaches a different result from the majority—one that respects both "the dignity of man," *Hope*, 536 U.S. at 738, and the necessity of preserving prison security. A proportionality framework incorporates no such balancing, evincing no concern for the health or safety of prisoners or even the security justification for a harsh punishment.

In fact, the exercise restrictions were contrary to defendants' security interests. Considering prison officials' "acknowledgment that his mental illness contributed to" his misconduct, it was particularly counterproductive to "use that conduct as a basis to deny yard privileges" when "access to exercise is recognized

as critical for mental health" and its denial "creates the strong likelihood of further psychological injury" and further misconduct. Op.33 (Rovner, J., dissenting); *see also* Op.21 n.2 (Rovner, J., dissenting) (noting that amici, numerous former corrections directors, offered evidence that "decreased use of isolation and an increase in out-of-cell exercise in institutions has consistently resulted in a substantial decrease in violence, resulting in an improvement of prison security and a reduction of operating costs").

The majority's framework would also perpetuate misery should it become commonplace. Consider what could happen in the Seventh Circuit alone. The IDOC regularly holds more than a thousand prisoners in solitary confinement. Correctional Leaders Association & Arthur Liman Center for Public Interest Law, Time-In-Cell 2019 9 (2019).[11] The story appears to be much the same in Indiana. *Id*. And Wisconsin also keeps a significant number of prisoners in solitary confinement. *Id*. at 10. At any given time, a disturbing number of those prisoners are likely to be seriously mentally ill. *Id*. at 48. Regular access to exercise may be all that stands between those isolated prisoners and catastrophe. Op.21 n.2, 33 (Rovner, J., dissenting). Yet the majority opinion grants prison officials virtually unfettered

---

[11]Available at https://law.yale.edu/sites/default/files/area/center/liman/document/time-in-cell_2019.pdf.

discretion to cut that lifeline. The "Constitution cannot countenance" that. Op.33 (Rovner, J., dissenting). This Court should not either.

## CONCLUSION

For the aforementioned reasons, the petition for panel rehearing or rehearing en banc should be granted.

Date:  May 18, 2022                    Respectfully Submitted,

/s/ Daniel M. Greenfield
Daniel M. Greenfield*
RODERICK & SOLANGE
 MACARTHUR JUSTICE CENTER
NORTHWESTERN PRITZKER SCHOOL OF LAW
375 East Chicago Avenue
Chicago, IL 60611
(312) 503-8538
daniel-greenfield@law.northwestern.edu

*Counsel for Appellant Michael Johnson*

*Lewis & Clark Law School student Monet Gonnerman contributed to this brief.

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g)(1), I certify that:

This brief complies with the type-volume limitation of Seventh Circuit Rule 32(a)(c) because this brief contains 3,788 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word 2019 and Times New Roman 14-point font.

Date:  May 18, 2022                          */s/ Daniel M. Greenfield*
                                             Daniel M. Greenfield

                                             *Counsel for Appellant Michael Johnson*

## CERTIFICATE OF SERVICE

I hereby certify that on May 18, 2022, I electronically filed the foregoing *Petition for Rehearing or Rehearing En Banc* with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


Date:  May 18, 2022                    */s/ Daniel M. Greenfield*
                                       Daniel M. Greenfield

                                       *Counsel for Appellant Michael Johnson*